In the Matter of the Complaint of TA CHI NAVIGATION (PANAMA) CORP., S.A., as Owner of the S.S. EURYPYLUS for Exoneration from or Limitation of Liability.

No. 75 Civ. 5994 (CHT).

United States District Court,
S. D. New York.

Nov. 5, 1980.

Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for various cargo claimants; Raymond P. Hayden, Donald M. Burke, Joseph M. Mangino, New York City, of counsel.

Donovan, Maloof, Walsh & Kennedy, New York City, for claimant, third-party plaintiff Citibank, N.A., Charles C. Goodenough, New York City, of counsel.

## OPINION

TENNEY, District Judge.

This is an action brought by complainant Ta Chi Navigation (Panama) Corp., S.A. ("Ta Chi") for exoneration of its steamship S.S. EURYPYLUS under the Fire Statute of the United States, 46 U.S.C. § 182, and for limitation of damages under 46 U.S.C. § 183. The action arises out of an explosion and massive fire on board S.S. EURYPYLUS on November 10, 1975 while the ship was at sea proceeding from Taiwan around the world. The explosion and fire resulted in the deaths of and injury to certain officers and members of the crew, and damages to cargo and belongings. As a result it became necessary to abandon the ship, and she became a constructive total loss. Various claimants have filed claims and answers denying Ta Chi's right to exoneration and/or limitation of liability and seeking full recovery of their claims for cargo damage, personal injury, and salvage, but these claimants were enjoined from proceeding and their claims were consolidated in one action in accordance with 46 U.S.C. § 185.[1] The issue of liability only has been tried by the Court. At the commencement of the trial, the personal injury and death claims were settled as between those claimants and Ta Chi.

## FINDINGS OF FACT

1. This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. This court has jurisdiction of this proceeding.

2. The petitioner, Ta Chi, is a corporation organized and existing under the laws of the Republic of Panama with its principal office and place of business in Taipei, Taiwan, and was at all material times hereto the owner of the steamship, S.S. EURYPYLUS.

3. Cargo claimants are shippers and consignees who shipped cargo on board S.S. EURYPYLUS in accordance with the shipowner's bill of lading and pursuant to the United States Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300 et seq. (hereinafter "COGSA").

4. The S.S. EURYPYLUS was a steel general cargo ship built in 1958 in Port Glasgow, Scotland under the requirements of the 1948 Safety of Life at Sea Act Convention and the requirements of the laws of the United Kingdom for merchant vessels. Originally the ship was named the S.S. MANGLA. The plans for the ship were approved by Lloyd's Registry of Merchant Shipping with a 100A–1 classification. The ship had the following registered dimensions: length 151.49 meters (497 feet); beam 19.33 meters (63 feet); gross tonnage 8,601 tons; net tonnage 4,419 tons. The ship was equipped with two steam turbine engines generating 8,000 horsepower. She had a 'tween deck running the length of the ship, and had six hatches on or above the level of the main deck. Hatch # 1 was situated immediately aft of the forecastle deck, the hold extending forward under that deck. Aft of hatch # 1 was a raised structure for winches and controls serving the heavy multiple crane which, together with the foremast, was located there. Aft of this structure was hatch # 2, and further aft a raised structure for winches and controls serving another heavy multiple crane. Finally, between the crane structure and the midship accommodation house was hatch # 3, with a light double crane situated between the hatch and the midship accommodation house.

---

1. *Rohm & Haas Co. v. S.S. EURYPYLUS, et al.*, 75 Civ. 5768 (cargo damage); *Ta Chi Navigation Corp. v. S.S. LARRY L, et al.*, 75 Civ. 5920 (salvage); *El Fortuna, Inc. v. S.S. EURYPYLUS, et al.*, 77 Civ. 380 (salvage).

The midship accommodation house occupied the full width of the ship and extended fore and aft approximately 148 feet. It rose some 42 feet from main deck level and was divided by three decks, i. e., the bridge deck, the promenade deck, and the boat deck. One level above the boat deck and forward was the navigating bridge structure. Aft of this structure was the ship's funnel and ventilators. The various decks of the midship accommodation house will be described in greater detail hereinafter.

Just aft of and extending into the midship accommodation house forward to the engine room casing above the main deck was the refrigerating machinery room, the ship being fitted out to carry refrigerated cargo in reefer compartments located in the after section of hatch # 3 and the forward section of hatch # 4, in both cases on the 'tween deck. The structure housing the refrigeration machinery rose to the level of the bridge deck, the top of the structure constituting a continuation or extension of that deck in the midship accommodation house. Atop the extended bridge deck and immediately aft of the upper midship accommodation house was hatch # 4, a smaller hatch lengthwise than hatches # 1, # 2 and # 3 forward of that structure. Immediately aft of hatch # 4 and at bridge deck level was a heavy multiple crane with winches to port and starboard, while further aft on the bridge deck extension was a swimming pool. Immediately aft of the deck extension was hatch # 5. Then, moving further aft, was a raised structure rising to the level of the bridge deck extension and housing, inter alia, the cargo office and switchboard locker, atop of which structure was situated a heavy multiple crane. Aft of this structure was hatch # 6, slightly smaller than hatches # 2, # 3 and # 5 but larger than hatches # 1 and # 4.

Aft of hatch # 6 was the structure which contained the living accommodations for the crew. Directly below and slightly above 'tween deck level was the steering gear platform where the steering gear machinery was located. It was here that the diesel emergency fire pump was situated, forward of the steering gear machinery and readily accessible by means of a ladder in the crew's accommodations on the main deck. At main deck level, where the spiral stairway from the shaft alley terminated, were situated the quarters for members of the crew. On the deck above, or poop deck, were separate galleys and mess rooms, one for the engine room members of the crew, the other for the seamen or members of the deck department. The top level of this structure constituted the docking bridge which also contained a small hospital space.

5. The engine room/boiler room spaces (hereinafter sometimes "the engine room spaces") and equipment of S.S. EURYPYLUS to the extent pertinent were as hereinafter described.[2]

In the bottom of the ship were two contiguous double bottom tanks on top of which, commencing on the starboard side, were the # 1 diesel generator and # 2 diesel generator with the high pressure turbine and low pressure turbine (atop the main condenser) amidships and # 3 diesel generator on the port side. Approximately 3 feet above the base of the three generators and main condenser was the bottom platform, or first level. The three diesel generators rose approximately to the second level about 10 feet above. This was primarily the maneuvering platform located in the forward half of the engine room and forward of the high pressure and low pressure turbines. The gear box for the turbines was located directly aft, and aftermost amidships was the main electric switchboard.

2. The Court has attempted to reconstruct the engine room spaces from the testimony of engineering personnel and drawings prepared by Sidney Cook, an engineering expert and fact witness employed by P.D. Marchessini Ltd., prior owners of S.S. EURYPYLUS, who testified on behalf of Ta Chi (Ta Chi Exhs. YYY and ZZZ). Although the General Arrangement plan of S.S. MANGLA (S.S. EURYPYLUS) was received in evidence (Ta Chi Exh. D; Claimants Exhs. 1 & 3) and has formed the basis for the Court's findings regarding the ship's arrangement (excluding the engine room spaces), the separate plan for the machinery arrangement, referred to in the General Arrangement plan, was never produced.

The maneuvering platform consisted of grating but as it proceeded forward it became steel plate on which the port main boiler and starboard main boiler were situated. The main engine maneuvering board was located amidships aft of the two boilers. The port boiler gauge board was situated slightly aft and outboard of that boiler; the starboard boiler gauge board was situated slightly aft and outboard of that boiler. Forward of the main boilers and amidships was the Cochran donkey boiler or auxiliary boiler with its pumps and heater, while to port and starboard of the auxiliary boiler, were diesel and fuel oil deep or settling tanks. The main boilers and auxiliary boiler rose from slightly below the 'tween deck almost to the level of the main deck.

About 3 feet above the second level or maneuvering platform was the third level, actually the lower 'tween deck, which could be reached from the second level by two short ladders (two similar ladders to port and starboard aft of the turbines were also available). One ladder served the port side of the third level and was located to port and slightly forward of the low pressure turbine. There was also a ladder adjacent to this short ladder which descended directly to the first level 12 to 13 feet below. The turbo generator was located on the port side of this third level, and between that and the port side of the ship were a series of diesel and lubricating tanks, forward of which the port boiler fan was located, and further forward the fuel oil pumps and heaters. Directly aft of the turbo generator was the motor generator for lighting. The second short ladder served the starboard side of the third level and was located to port and slightly forward of the high pressure turbine. There was also a longer ladder which was located just forward of the turbo generator and descended to the first level near # 3 diesel generator. On the starboard side of the third level was located the engine room workshop and above that the diesel spare part store which was reached by a ladder aft of the work-shop. Further aft of the workshop was the distilling plant. Forward of the workshop was the starboard boiler fan, and further forward the low pressure steam generator and fuel and diesel oil deep tanks.

Sixteen feet above the third level was the fourth level or main deck of the vessel. The engine/boiler room space continued from the main deck through the bridge deck and promenade deck to the boat deck atop the superstructure. However, this space was separated between engine space and boiler space above the main deck, i. e., on the main deck, partially by an engineers' storeroom amidship on the port side; on the bridge deck, completely by a stairway and engineers' sanitary facilities; and on the promenade deck, by the stairway and officers' sanitary facilities, all similarly situated. Egress to the boat deck was effected through an escape hatch. There was no skylight. The space from the main deck to the boat deck was sheathed in steel with insulation. Access to the engine/boiler room spaces was effected on the main deck by a door on the port side and on the bridge deck by a door on the starboard side of the engine room space. There was also a door aft on the port side leading to the cargo refrigerating machinery.[3] A walkway proceeded along the port side and around the space at main deck level and presumably another walkway and/or ladder served the bridge deck. From the main deck walkway a stairway descended to the third level. The other principal access was effected through the shaft tunnel around the first level. It ran aft from the casing of the engine room near the high pressure turbine and above the shaft a distance of approximately 160 feet to where it was connected by a ladder with a large spiral stairway ascending to the accommodation superstructure at the stern of the ship, thus giving ready access to the engine room spaces to the crew members berthed aft.

6. The spaces of the midship accommodation house were, to the extent pertinent, described as follows:

---

3. The presence of this door is not disclosed on the General Arrangement plan. It is disclosed on one of Cook's drawings (Ta Chi Exh. ZZZ).

See note 2 *supra*. The presence of such a door is logical and, as will appear, significant.

*Main Deck*—At main deck level the accommodation house had two entrances with doors leading into what has been referred to as the tonnage alleyways. On the port side the entrance also lead into a parallel passageway outboard of the tonnage alleyway which extended aft some 48 feet. Along the outboard side of this passageway were cabins designed for the ship's carpenter, petty officer and those few members of the crew quartered there. The passageway terminated, after a sharp turn inboard, in a steel bulkhead part of the port side of the tonnage alleyway. Directly across from this bulkhead and on the port side of the parallel passageway was a door which gave access to sanitary facilities serving the living accommodations and also to a ladder to the boat deck above. Along the inboard side of the parallel passageway were various storage spaces, a drying room, and at the further end aft, the steward's paint shop. The bulkheads on both sides of this passageway were made of wood. In order to proceed aft through the structure on the port side at main deck level it was necessary to turn left upon passing the carpenter's accommodation and proceed a few feet beyond the row of storage spaces. Turning to the right, one proceeded directly aft through the port tonnage alleyway. This alleyway was 4 feet wide and extended directly aft in a straight line for approximately 90 feet. There was steel bulkheading along both sides of this alleyway, and on the starboard side length of the engine room spaces was steel casing. Proceeding aft in the tonnage alleyway one had to pass a locker and drying room, to which access could only be attained via the parallel passageway serving the living quarters, the storerooms and the steward's paint shop, with access thereto only from the tonnage alleyway. There was no further access outboard of the tonnage alleyway until it swung outboard and then continued aft along the port side of the ship. However, adjacent and outboard of the port side bulkhead of the tonnage alleyway was a second narrow parallel passageway, access to which was by a door leading from the space outside the living accommodations forward which have been described above. Proceeding aft along this narrow passageway one passed first the dispensary, then space and living quarters designed for the ship's fitter, and finally, at the end of the passageway, what was described as a hospital. Except for a door giving access to a motor room situated in the forward section of the tonnage alleyway, the only access facility on the inboard side was the door to the engine room located approximately 65 feet along the main portion of the tonnage alleyway. Roughly 6 feet forward of that door and on the outboard bulkhead of the passageway was a metal rack with 10 apertures approximately 8 inches in diameter which were used for the storage of oxygen, acetylene, and possibly freon cylinders.[4] Approximately 10 to 15 feet aft of this rack the tonnage alleyway turned outboard to the port side of the ship and continued a further distance of some 45 feet to the after bulkhead of the amidship structure where there was access to the open main deck aft immediately adjacent and to port of hatch # 5. However, this opening was closed by wooden planks fitted into steel channels.

Unlike the tonnage alleyway on the port side of the ship, the starboard tonnage alleyway ran aft in a straight line for almost its entire length. Access was gained through a door in the forward bulkhead on the port side of the ship. Moving aft, the starboard passageway ran some 135 feet terminating in open access to the main deck near to starboard rail. This open access, like that to the after end of the port tonnage alleyway, was closed by wooden planks fitted into steel channels. Juncture with the port tonnage alleyway was effected by a passageway athwartship about 12 feet aft of the forward bulkhead of the structure. In effect, and as will be developed hereinafter, both the port and star-

---

4. Although there is evidence supporting the presence of one or more cylinders of freon gas, there is no explanation of the purpose of such stowage. It is significant that freon was taken aboard in bulk rather than in cylinders, and that piping for the freon gas ran from the refrigeration machinery room through the tonnage alleyway to the refrigeration spaces.

board alleyways were closed to the sea fore and aft (*i. e.*, forward by doors, aft by wooden planks). Had these doors been watertight doors this main deck space would not have been considered as "open deck" for cargo and tonnage purposes.

*Bridge Deck*—One deck above the main deck was the bridge deck, which could be reached from within the amidships structure by two stairways leading up amidships from the living accommodations along the port side of the ship and by a single stairway in the forward portion of the starboard tonnage passageway. There were also four stairways abutting the structure fore and aft and to port and starboard giving outside access to that deck. Situated on the bridge deck were the living quarters for the officers in the engineering department, the assistant purser and the chief steward. An inner passageway ran along the port side of the deck inboard of the living accommodations and outboard of the engine/boiler room casing. A similar passageway ran along the starboard side of the casing and inboard of the living accommodations, the duty mess, galley and pantry on the starboard side. Both passageways were reached through doors opening forward onto the open deckway surrounding the structure. Both passageways terminated in the saloon or officers' mess directly aft and abutting the engine room casing. This messroom extended approximately 32 feet athwartship and 16 feet fore and aft. The chief steward's quarters were to port of one end of the messroom, the pantry to starboard of the other end. Forward of the engine room spaces was the main stairway amidship and then a passageway between running athwartships to connect the two parallel fore and aft passageways. Access to the engine room spaces was through a door on the starboard side of the engine room casing. The stairways described above rising from the main deck continued on to the deck above the bridge deck and the promenade deck.

*Promenade Deck*—One deck above the bridge deck was the promenade deck. Here were situated the quarters for the deck officers other than the master. Fore and aft parallel passageways similar to those on the deck below ran along the sides of the engine/boiler room casing. Forwardmost on the port side was the office and quarters for the chief officer. Moving aft along the passageway was an alley giving access to the open deck, then the doctor's quarters, followed by three passenger staterooms. Just aft of the engine room casing was the passengers' lounge. Living quarters for the other deck officers were situated along the starboard side of the engine room spaces outboard of the starboard fore and aft passageway. Forward of the casing and main stairway was a passageway athwartship forward of which was the officers' lounge amidship. Both parallel passageways opened fore and aft on the open deck, with further access to that deck on the port and starboard sides forward. Access to the deck above was by the main stairway forward of the engine room spaces or by stairways to port and starboard aft on the open deck. There was apparently no access to the engine room spaces from this deck level.

*The Boat Deck*—Situated above the promenade deck was the boat deck where the master's stateroom was located amidships and forward of the main stairway. Aft of the main stairway the boiler room casing continued to the deck above, terminating in the ship's funnel. There was an escape trunk from the boiler room space opening onto the open boat deck on the starboard side. The engine room space was topped by the boat deck and by locker space, including two lifesaving equipment lockers, one on the starboard side, the other on the port. Further aft and amidships was an area presumably for the passengers. To port and starboard of these midship spaces there was open deck space, equipped to carry awnings above the deck, outboard of which were located the ship's lifeboats. Lifeboats # 1 and # 3 were located on the starboard side, motor lifeboat # 2 and lifeboat # 4 on the port side, all with winches and davits to swing them outboard and lower them into the sea.

*The Navigating Bridge*—Finally, the topmost structure was the navigating bridge

containing the wheelhouse forward with wings on the open deck extending to port and starboard and slightly outboard of the ship's sides. Just aft of the wheelhouse was the chart room to port and the radio shack to starboard separated by a fore and aft passageway and terminating in a passageway running athwartships with the main stairway aft and amidships and locker spaces to port and starboard of that stairway.

As hereinbefore noted, the engine/boiler room casing rose from the ship's bottom through the upper decks, with the engine room casing terminating at boat deck level, and the boiler room casing at the funnel level aft of the navigating bridge. This casing was originally 0.26 inch thick but was later increased by 0.04 inch to 0.30 inch. It was steel and of riveted construction. However, at 'tween deck level the boiler room casing enclosed a larger area than did the engine room casing. At main deck level there was an engineer's storeroom along the port side of an intervening space between the engine room and boiler room spaces although the casing surrounded the entire engine/boiler room space. Above the main deck there was separate casing for the engine room and boiler room spaces with a stairway and sanitary facilities situated in the space between these casings at bridge deck and promenade deck levels.

Of no little significance is the fact that the bulkheads on the main deck outboard of the port tonnage alleyway and inboard of the ship's hull separating and enclosing the living quarters were made of wood as were the bulkheads to port and starboard of the casing on the bridge and promenade decks.

*Ventilation*

Ventilation of the engine/boiler room spaces was accomplished by an arrangement of two inlet and one exhaust electrically powered fans, the ventilation system extending up from main deck level to the boat deck. The discharge system was a closed type electric motor activated by two sets of buttons, one set on the side of the motor, the other outside the engine room casing on the bridge deck. This system placed the engine and boiler room under constant pressure. The inlet fans blew air into the engine room at approximately 1½ inches of water pressure, while the exhaust system was at a pressure of ½ inch of water, so that the space was under a constant pressure of one inch of water. The intake of air was approximately twenty-two to twenty-five thousand cubic feet per minute. Accordingly, if any doors to the casing at main deck level were open, a massive flow of air would pass out of the engine/boiler room space through that door.

*Fire-Fighting Systems*

7. There were two principal systems for fighting a major fire aboard S.S. EURYPYLUS, a water system and a steam system. The water system consisted of a fire main utilizing pumps, hydrants, hoses and nozzles with the hydrants located at strategic locations on deck, within the deck structures, and within the hull of the ship. The steam system was a smothering system utilizing steam from the main and auxiliary boilers with outlets in the engine room and in the cargo holds. The main boiler system was utilized when the ship was under power, the auxiliary boiler system while in port.

8. The fire water main system may be roughly described as a square within the square of the midship accommodation house with two arms, one extending aft along the starboard side of hatches # 4, # 5 and # 6, the other extending forward along the port side of hatches # 3, # 2 and # 1. Commencing aft at main deck level, the fire main extended athwartship just aft of hatch # 6 with a hydrant located at the port end of the extension. There was also an extension and risers servicing the aft accommodation structure. The main proceeded forward from the athwartship extension along the starboard side of hatches # 6 and # 5, turning and running to port along the forward side of hatch # 5 to the port side of the ship where there was a multiple hydrant. Between hatches # 6 and # 5 and between hatches # 5 and # 4 there were extensions running to the bottom of the ship. At main deck level, the main proceeded beyond the multiple hy-

drant on the port side for a short distance to enter the midship accommodation house before it bifurcated, one section proceeding athwartship to the starboard side of the ship and thence forward, the other section following the path of the port tonnage alleyway exiting the accomodation structure through the pipe tunnel amidships and directly aft of hatch # 3. It then proceeded to port and thence forward along the port side of hatches # 3, # 2 and # 1 with extensions to the ship's bottom aft, between, and forward of those hatches. In the midship accommodation structure there were risers to the upper decks so that, although the section of the fire main on the starboard side of the main deck did not rejoin the section servicing the port side of the structure on main deck level, this was accomplished through risers serving the bridge and boat deck levels.

The fire main was serviced by the fire or general service pump, or by a ballast pump, which were driven by electricity and situated in the engine room. There was also a steam-driven pump and a bilge pump in the engine room which, by the use of several valves, might have serviced the fire main. Outside the engine room and in the stern of the ship was a diesel-powered fire pump situated in the steering machinery room below the main deck. This emergency fire pump fed directly into the fire main aft.

Water command valves were situated on the port side of the bridge deck in the accommodation passageway above the tonnage alleyway. By operating one or the other of these valves it was possible to isolate sections of the fire main, i. e., the engine room section or the sections forward and aft.

9. The emergency fire pump which fed directly into the fire main, was situated in the steering gear room aft and consisted of a twin cylinder "Petter" diesel engine which drove a "megator" fire pump. The pump had a capacity of 25 cubic meters per hour (110 gallons per minute) and was situated approximately 8 feet below the main deck. It had an independent fuel supply. Sea water was drawn through an opening in the ship's bottom. A valve in the steering gear room controlling the opening and shutting of the system was connected by a series of gears and spindles to the opening in the ship's bottom. The valve could also be activated in deck space directly below the steering gear room that was reached by a descending ladder. Access to the steering gear room itself was by a ladder from the main deck, not by the spiral stairway leading from the shaft tunnel.

10. S.S. EURYPYLUS was equipped with a fixed steam smothering system in the engine room and all of the cargo holds, from which steam could be injected from the main boiler and the auxiliary boiler into the boiler and engine room spaces and the holds. The main controls were situated on the third level of the engine room. There were two valves situated on the port side of the engine room connected to the main boiler system and two valves on the starboard side connected to the auxiliary boiler system. One of the two valves on the port and starboard sides of the engine room controlled the injection of steam into the engine and boiler room spaces. The other valve in each case fed steam into the system involving the cargo holds. In addition, situated by each hold was a separate valve which had to be opened with a spanner. Remote controls for the engine and boiler room system were located in the main bridge deck tonnage alleyways, one on the port side for the main boiler system, and one on the starboard side for the auxiliary boiler system. In the port tonnage alleyway, the remote control was situated within a few feet of the oxygen-acetylene storage rack. This remote control system consisted of hand wheels located outside the engine room casing which were connected by spindles to the steam smothering valves in the engine room on both the port and starboard sides. In addition, at the same locations there was another valve on the port side which remotely controlled the steam to the oil fuel service pump in the engine room, and another on the starboard side remotely controlling steam to the sanitary system.

11. The S.S. EURYPYLUS was purchased by Compania Maritima San Basilio S.A. ("San Basilio") from the Cunard Brockle Bank Company in 1971 and thereafter operated on behalf of the purchaser by P.D. Marchessini Ltd. ("Marchessini"). Prior to such purchase the ship, originally named S.S. MANGLA, flew the British flag. She was operated by Marchessini from April 1972 until December 1974 when the ship was delivered to Ta Chi pursuant to a contract of sale signed in August 1974. This contract, a standard Japanese Shipping Exchange form with amendments, required that the ship be delivered in full class with no outstanding recommendations. Any deficiencies at time of delivery, including missing equipment, were to be made good by the seller, San Basilio.

12. Prior to the purchase of S.S. EURYPYLUS from Marchessini, Ta Chi entered into a contract with Kee Yeh Shipping Company of Taipei, Taiwan ("Kee Yeh") whereby Kee Yeh as owner's agents were to supply all technical, naval architectural, marine engineering and general husbandry services required to maintain and provision the ship in a condition fit to discharge the duties for which she was designed and employed. Y.Y. Yu ("Yu") was general manager of both Ta Chi and Kee Yeh, and each corporation had only two officers, a chairman and Yu as general manager. Ta Peng Shipping Co. ("Ta Peng") handled cargo for Ta Chi, and its United States agent was Transnational Maritime in New York. C.C. Lee was chairman of Kee Yeh and P.C. Hsaio was chairman of Ta Peng and Ta Chi. Together they had formed Ta Chi as owner of the ships they would service.

13. S.S. EURYPYLUS was required to comply with the regulations of Lloyd's Registry of Merchant Shipping ("Lloyds"), a recognized classification society, and the requirements of the Safety of Life at Sea Convention ("SOLAS"). She was classed by Lloyds, and her safety and fire-fighting equipment was regularly surveyed by Lloyds at least every two years. She met or exceeded the requirements set by both SOLAS and Lloyds. The equipment aboard S.S. EURYPYLUS included: three fire pumps; twenty-eight hydrants; twelve hoses and nozzles (conical and spray-type nozzles), of which four nozzles were located in the engine room; forty-two fire extinguishers; a fixed steam fire-fighting system for the engine room and cargo holds; three firemen's outfits; and one emergency fire pump which was located in the steering gear room at the stern of the ship and has already been referred to.

14. On April 9, 1974, while under San Basilio ownership and Greek registration, S.S. EURYPYLUS was inspected by a Lloyds surveyor. Each piece of fire-fighting and safety equipment was subject to a complete and detailed inspection, and a safety equipment certificate valid until April 8, 1976 was issued to the ship. However, when the flag of a ship is changed from one country to another, a complete inspection of all the ship's fire-fighting and safety equipment must be conducted, even though a valid safety equipment certificate is in effect. Accordingly, a detailed inspection of the ship's fire-fighting and lifesaving equipment was conducted by a Lloyds surveyor on behalf of the Government of Panama at the time of the delivery of the ship to Ta Chi on December 14, 1974.

15. At the time of the delivery of S.S. EURYPYLUS to Ta Chi, M.M. Hwang ("Hwang"), engineering manager of Kee Yeh, and his staff, in accordance with the terms and conditions of the contract of sale, checked all navigation equipment and machinery aboard the ship, and inspected each item aboard, including spare parts and stores. They found nothing in need of repair or replacement. Hwang has also sent Kee Yeh personnel to Manila to sail with the ship from Manila to Taiwan prior to delivery to Ta Chi to familiarize themselves with the ship. They reported all to be in good order and condition.

16. With respect to fire-fighting and lifesaving activities, the engineering manager of Kee Yeh instructed the master and chief officer of S.S. EURYPYLUS to conduct fire and boat drills at least once a month in accordance with the provisions of

SOLAS, which required such drills weekly on ships carrying passengers and monthly on cargo ships. S.S. EURYPYLUS, following her purchase from San Basilio, no longer carried passengers.

17. Lifeboat and fire-fighting stations were shown on a muster list printed in Chinese and English, indicating each man's duty for both fire and boat drills. This list was posted on the bridge and in the passageway outside the main dining saloon. There was also a white duty card on the door of each man's cabin stating his station in the event of a fire and boat drill. In addition, S.S. EURYPYLUS had a plan posted in the alleyway outside the main dining saloon setting forth the precise location of each piece of fire-fighting apparatus. A lifesaving equipment plan setting forth the precise location of each piece of lifesaving apparatus on board the ship was similarly posted. A chart in the engine room indicated the locations of fire-fighting equipment in the engine room spaces. Each of the officers aboard received fire-fighting training while attending Taiwan Maritime College before obtaining his license as an officer.

18. At the time of the delivery of S.S. EURYPYLUS to Ta Chi, a lifeboat and fire-fighting drill in which all crew members participated was conducted.

19. After delivery of S.S. EURYPYLUS to Ta Chi in December 1974, she completed one voyage which took her to Japan, through the Panama Canal to Puerto Rico, Germany, Belgium, England, then through the Suez Canal to the Far East and Taiwan. The voyage commenced in the spring of 1975 and terminated in late September of that year. On this first voyage the ship encountered difficulties with the # 2 generator. The bearings burned out, and the chief engineer had to replace the bush and pin. At the termination of the first voyage he requested that the # 2 generator be repaired, which was done.

20. Prior to the departure of S.S. EURYPYLUS from her home port of Kaoschiung, Taiwan on October 2, 1975, Hwang, the engineering manager of Kee Yeh, reviewed the log book of the vessel and noted the entry of monthly fire drills during the prior voyage. He also checked all navigation and engine room equipment and found it to be in good order and condition. He further inspected all fire-fighting and lifesaving equipment and found that all fire extinguishers, fire hoses, and nozzles were in their proper location.

21. The 1st officer of S.S. EURYPYLUS was responsible for inspection of the fire-fighting equipment aboard the vessel and it was his responsibility to direct the fire-fighting efforts. Prior to departure from Kaoschiung, the 1st officer inspected all fire-fighting equipment on deck and found all to be in good order and condition and in the proper location set forth in the fire-fighting equipment plan.

The 1st engineer was responsible for the fire-fighting and safety equipment in the engine room. Prior to departure, and at the request of the 1st officer, he inspected all of the fire-fighting and safety equipment in the engine room and found all to be in good order and condition.

22. Prior to the commencement of the voyage the steam smothering system for the engine and boiler rooms was tested by the 1st engineer and the system for the cargo holds was inspected and checked by the 1st engineer and the 1st officer, although steam was not actually injected into the cargo holds due to the presence of cargo. Both systems were operational.

23. At the time S.S. EURYPYLUS sailed from Kaoschiung, Taiwan on October 2, 1975 she was manned as follows: Master, 1st officer, two 2nd officers, a 3rd officer, chief engineer, 1st engineer, two 2nd engineers, a 3rd engineer, an assistant 3rd engineer, an electrician, a fitter, a radio operator, a quartermaster, a bosun, a chief cook, a 2nd cook, a chief steward, seven able-bodied seamen, three ordinary seamen, three oilers, three firemen, two wipers, and three maintenance men. Of the total crew of forty, eighteen were Chinese, twenty-two were Filipino. All of the officers were Chinese and all were quartered in the accommodation house amidships, together with

the quartermaster, bosun, the electrician, the fitter, the chief steward, and an oiler. All but one or two of these were also Chinese. While this voyage was the first for some of the officers, many of them and of the crew had served on the first voyage. Despite the difference in national origin, communication between officers and crew was not seriously impeded.

24. The bills of lading issued by Ta Peng for the cargo loaded aboard S.S. EURYPYLUS on this voyage were "subject to the provisions of the Carriage of Goods by Sea Act of the United States of America, approved April 16, 1936, which shall be deemed to be incorporated herein . . . . " [5]

25. After departing Kaoschiung, the vessel proceeded to Keelung, Taiwan to load cargo and stores, arriving there on October 4, 1975. Among other stores, she loaded seven filled oxygen cylinders, two filled acetylene cylinders, and 1,450 pounds of freon. These ship's stores were billed directly to Ta Chi. At Keelung, Hwang, the engineering manager of Kee Yeh, together with Ho, the port engineer of Kee Yeh, observed the cylinders in the rack in the tonnage alleyway on the main deck previously described. Hwang had sailed aboard the vessel from Kaoschiung to Keelung.

26. From Keelung the vessel proceeded to Kobe, Japan to load cargo, departing on October 23, 1975.

27. A few days after leaving Japan a lifeboat drill and a fire drill were conducted aboard S.S. EURYPYLUS. The signal for the lifeboat drill was one long blast and seven short blasts on the ship's whistle, that for the fire drill was the rapid sound of a bell for ten seconds, then indication of the location of the fire by electrically powered microphone. The fire drill assumed the existence of a cargo fire in hold # 4. This location was selected because repair work was in progress on the forward deck and cargo was stored on the after deck at # 5 and # 6 holds. During the fire drill the general service or fire pump was used, as was the emergency fire pump. Both pumps were fully operational. The lifeboat and fire-fighting drills were entered in the log by the 1st officer.

28. At some time during the period from October 2, 1975 to November 10, 1975 further difficulty with the electrical system aboard S.S. EURYPYLUS was encountered, this time at the main electrical switchboard. A fuse for the air-conditioning system blew out causing the connection coil to the magnetic switch for the generators to burn out. The connection coil and fuse, both located in the main switchboard, were replaced and operated normally thereafter.

29. On November 9, 1975 the chief engineer found a leak in the 4 inch diesel transfer pipeline. This pipeline transferred diesel oil from the diesel oil tank to the diesel settling tank on the second level of the engine room by means of an electric transfer pump on the bottom level. The transfer pipeline was on the bottom level of the engine room just outboard of the port main boiler and just forward of generator # 3. When the chief engineer discovered the leak he had the 1st engineer put a clamp about 3 inches long over the leakage area which stopped the leakage and permitted the transfer of oil to the settling tank for up to two hours that afternoon.

30. On the following day, November 10, 1975 at 8 a. m., the chief engineer made his daily inspection of the equipment in the engine room spaces which included a check of diesel generators # 1 and # 3 for oil pressure, measurement of fuel and lubricating oil, revolutions, temperature and unusual sounds or leakage. He found everything in good order. Only generators # 1 and # 3 were operating on line that day, with generator # 2, which had experienced difficulty on the prior voyage, held on reserve.

---

5. As previously noted, Ta Peng acted as agent for Ta Chi insofar as cargo was concerned. (Claimants Exh. 14).

After completing his inspection the chief engineer asked the 1st engineer to help him take down the section of 4 inch pipe where the leakage had taken place. The 1st engineer was on watch for 8–12 a.m. and 1–5 p.m., although the engineer in charge was the 2nd engineer. There was one oiler and one fireman on each watch, and in addition on daytime watches, there was the fitter and two wipers along with the assistant 3rd engineer. The 1st engineer, together with the fitter and a wiper, removed a 10 foot section of the pipe by unbolting the flanges at the ends. The ends of the remaining pipe were closed off with flanges and gaskets. The removed section was brought up to the workshop and the 1st engineer instructed those on duty in the workshop to clean the oil from the pipe. The pipe was then fixed securely by spot-welding two steel files to the deck and one side of the pipe, and the damaged portion of the pipe section excised.

The spot-welding and excision of the pipe was accomplished by the fitter utilizing electric welding equipment permanently connected in the workshop with a transformer located there. Power was received from the electric generators through the main electric switchboard. A trolley unit furnished mobility to the equipment which was activated by a switch.

After the pipe had been cleaned and fixed to the workshop deck, the chief engineer instructed the 1st engineer and the fitter to connect up the hoses to an oxygen and an acetylene cylinder stowed in the rack in the tonnage alleyway on the main deck. The hoses were normally stored, together with spare hose or extensions, on a shelf next to the rack. In order to reach the workshop in the engine room the hoses were led through the door on the port side of the casing leading off the alleyway, then along the catwalk athwartship to a stairway which descended at a point approximately one-third the distance along that catwalk, from port to starboard, to a platform midway between the second and fourth levels. The stairway continued from the platform to the second level, terminating between the high pressure and low pressure turbines.

The hoses did not extend to the second level but were led off at the stairway platform level across into the workshop on the third level. Where the hoses passed along the catwalk and stairway they were tied to the pipe railing so that the hoses would not get loose and come into contact with the deck. The oxy-acetylene system was rigged on a standby basis during the morning watch because of the need to conserve oxygen. The work which had been going on on the hawse or chain pipe on the forward deck of the ship during the past two weeks had exhausted all but one cylinder of that gas. However, it was clearly the intention of the chief engineer to use the system during the afternoon watch,[6] although it was not normal to extend the hoses down into the workshop in the manner just described.

*The Oxy-acetylene system*—The oxy-acetylene system consisted of separate cylinders of oxygen and acetylene with pressure gauges affixed at the top or neck of the cylinder. The pressure, at least in the acetylene cylinder, was 264 pounds per square inch. The cylinders were opened or shut by fitting a key onto a square notch on top of the cylinder to activate the valve there. This key was kept by the fitter near the cylinders. Separate hoses were connected to the oxygen and acetylene cylinders, and, if necessary, additional lengths of hose were connected to reach the site of operations. The two hoses terminated at a torch which itself incorporated additional valves. At the base of the torch were two reducing valves, one for the oxygen, the other for the acetylene, to reduce the pressure and volume. Farther down the handle of the torch there was another valve which controlled the flow of both the oxygen and

---

6. The Court accepts the fact that the oxy-acetylene system was not actually used for welding or cutting on the day of the explosion. However, the chief engineer stated that he "intended to use it." (Ta Chi Exh. TTT, Deposition of Hsu, p. 156).

acetylene.[7] In order to light the torch it was necessary first to shut off the reducing valves and the torch valve and then open the valves on the cylinders. Once the valves on the cylinders had been opened, it was necessary to open and adjust the reducing valves. Finally, the torch valve was opened and by feeling by hand or smelling at the end of the torch one could determine whether the gases were emerging. Once this was determined, the torch was lighted and its intensity adjusted with the reducing valves setting the required proportions of the two gases.

After the oxy-acetylene system was rigged, work continued until noon with the electric welding system utilized to excise the damaged portion of the removed section and to weld a flange to the new piece of pipe cut to replace the damaged portion. At noon the chief engineer departed for lunch, leaving the 1st engineer, the fitter, and the wiper still in the workshop. On his way out of the engine room he checked the hoses along his path and also the valves on the oxygen and acetylene cylinders, although the 1st engineer had originally checked these valves when the system was rigged that morning and had reported them closed. After lunching and preparing his noon report and log entries the chief engineer again descended to the engine room workshop and told the fitter to machine up the remaining flange and instructed the 1st engineer "to get everything ready." Ta Chi Exh. TTT, Deposition of Hsu p. 82. Thereafter he returned to his cabin on the bridge deck, but on his way he again checked the hoses and the valves on the cylinders.

31. On November 10, 1975 at 1:50 p. m. S.S. EURYPYLUS suffered a catastrophic explosion and fire in her engine/boiler room space and midship accommodation structure. Her location at the time by dead reckoning was Latitude 24° 15′ N, Longitude 119° 35′ W. She was some 800 miles from her next port of call, Cristobal, Panama, with further ports of call in Puerto Rico and the Atlantic east coast of the United States. The sea was moderate.

32. At the time of the explosion, diesel generators # 1 and # 3, both main boilers, one feed pump serving both boilers, one distilled water pump, and two lubricating pumps were in full operation as was other electrically powered machinery.

33. At the time of the explosion there were ten officers and members of the engine department in the engine/boiler room space. During this afternoon watch the 3rd engineer was in charge, but subject to the 1st engineer. Also present were the 3rd engineer and the assistant 3rd engineer, two firemen (Donado and Raquino), two oilers (Gregorio Fernandez and Serna), one wiper (Elizande Fernandez) and the fitter. With the exception of the chief engineer and the junior assistant 2nd engineer, all of the officers in the engine department were in the engine or boiler room space at the time of the explosion. All of these officers were either killed, died as a result of the explosion, or were severely burned. The 2nd engineer (watch officer) and the assistant 3rd engineer were killed, and the 1st and 3rd engineers were severely burned. Among the other engine room personnel, two were killed, a wiper (Elizande Fernandez) and the fitter, while one fireman (Donado) and one oiler (Gregorio Fernandez) were severely burned. Only two persons, a fireman (Raquino) and an oiler (Serna),[8] emerged unscathed.

7. See drawing, Ta Chi Exh. AAAA.

8. Ta Chi attaches great significance to the fact that Serna was not burned, since Serna claimed that he was on the third level of the engine room facing to port and inboard of the generator which he was painting. He stated he saw no flash, only smoke, at the time of the explosion. Although he was standing under the tonnage alleyway and thus protected to some extent from the explosion of the cylinders through the port casing, the Court finds it difficult to explain his uninjured condition unless he was outboard of the generator.

Serna's testimony regarding his escape from the engine room is contradicted by other witnesses. Serna testified that he left through the shaft tunnel accompanied by Donato and Fernandez but not with the 1st engineer. Ta Chi Exh. VVV, Deposition of Serna, pp. 41–42, 81. He further testified that after he had assisted Donato and Fernandez to the main deck aft he

34.   Of the four killed, three (the assistant 3rd engineer, the fitter, and wiper Elizande Fernandez) were in the workshop on the third level and the fourth man (the 2nd engineer and watch officer) was in the immediate vicinity at the main controls.  The 1st engineer testified that the 3rd engineer, who was burned, was also in the workshop.  The 1st engineer was standing in front of or beside the starboard main boiler with the oiler Fernandez and two firemen, Donato and Raquino.  One of these two firemen, Donato, was on watch.  The other, Raquino, was on overtime preparing to paint the water feed line for the boiler.  As for the two oilers, one, Gregorio Fernandez, was on watch; the other, Serna, who was on overtime, testified he was painting the turbo generator on the port side of the third level aft.

35.   There was only one explosion at that time, although there were additional explosions late in the afternoon.[9]  The explosion at 1:50 p. m. was preceded by a "lightning" flash behind the 1st engineer, followed a few seconds later by a further flash and an explosion emanating from the area above the high pressure turbine and in the vicinity of the main electric switchboard.[10]  Simultaneously oxygen and acetylene cylinders in the port tonnage alleyway exploded or ruptured blowing inboard at least one large

aperture in the engine room casing,[11] and penetrating the refrigeration machinery room on the main deck and aft of the engine room sufficiently to burn a hole 14 inches in diameter in the deck of the officers' messroom in the aft midsection of the bridge deck above.  At the same time there was a complete electrical failure incapacitating all electrical equipment, e. g., the main fire pump, the ballast pump, various feed and lubricating pumps, all lighting equipment, all air-conditioning and ventilation systems, and all communication equipment (other than a manually operated wireless transmitter).

36.   With the explosion the engine/boiler room space was filled with dense smoke which, combined with the loss of lighting, made movement by those in that space extremely difficult.  While there was fire in some parts of the second and third levels, which, according to Serna, prevented him from reaching the foam extinguisher just forward of the low pressure turbine, this fire was caused by the explosive flash which also caused the burns suffered by the 1st engineer, the 3rd engineer, the fireman Donato, and the oiler Fernandez.  The main fire was above the third level and around the fourth, or main deck level which made exit at the main deck level impossible.  All

returned with the chief engineer and the bosun through the shaft tunnel to the engine room door but that they returned to the main deck aft because of the smoke.  *Id.* pp. 62–63.  The 1st engineer first testified that he escaped through the shaft tunnel with two men.  Ta Chi Exh. OOO p. 36.  In a later deposition he identified three men, Fernandez, Donato, and Raquino.  Ta Chi Exh. PPP p. 112.
Neither Fernandez nor Donato nor the 1st engineer mention the presence of Serna.  Ta Chi Exhs. MMM and NNN.  Fernandez confirms the presence of the 1st engineer.  Ta Chi Exh. NNN p. 7.  Serna's testimony about returning to the engine room with the chief engineer *after* he, Serna, had rescued Fernandez and Donato single-handed is revealing.  The chief engineer confirms the attempt to enter the engine room via the shaft tunnel, although he does not mention Serna.  Ta Chi Exh. TTT p. 88.  However, he had returned, due to the smoke, and had ordered the emergency fire pump started before he saw the 1st engineer come up from the shaft tunnel with two Filipinos, one badly burned.  *Id.* p. 97.  In other words, if Serna

accompanied the chief engineer it was only a short period of time after the explosion and *before* Fernandez and Donato had allegedly left the engine room with Serna.  Either Serna was lying or he was not in the engine room at the time of the explosion.
Raquino did not testify nor was he deposed. His exact position at the time of the explosion is not known, although he was in the same general location as the 1st engineer, Donato, and Fernandez and may have been sheltered by them.

**9.**   Ta Chi Exh. QQQ, Deposition of 1st officer Ting, p. 75; Ta Chi Exh. SSS, Deposition of 2nd officer Liu, p. 27.

**10.**   Ta Chi Exh. PPP, Deposition of 1st engineer Cheng, pp. 60–65, 183; Ta Chi Exh. MMM, Deposition of fireman Donato, p. 11.

**11.**   Ta Chi Exh. OO, photos numbered 23, 24, and 54; Claimants Exh. 5, photos numbered 63–66 incl.

those known to have escaped did so through the shaft tunnel running aft from the lower part of the engine room space.

37. In addition to the loss of electrical power, the explosion of the oxygen and acetylene cylinders in the port tonnage alleyway ruptured the fire main running along the overhead in the alleyway [12] and also made the port side remote control valves to the engine room steam smothering system inaccessible. However, by the time that system could have been utilized without jeopardizing lives in the engine room space, the fire had spread throughout the midship accommodation house and to one or more of the cargo hatches aft.

38. The explosion was not triggered by or related to any oil leakage in # 1 diesel generator but was caused by an accumulation of oxygen and/or acetylene gas in the engine room space above the high and low pressure turbines and gear box adjacent to the electrical switchboard. The gas was ignited by an electrical failure in the switchboard creating a flash explosion and a fireball which swept through the open port side door exploding and rupturing the oxygen and acetylene cylinders stored in the tonnage alleyway.

39. When the explosion occurred the chief engineer proceeded from his cabin on the bridge deck along the starboard passageway to the starboard entrance to the engine room space. Unable to enter due to heavy smoke he went down to the main deck but was unable to enter through the port side entrance.[13] Therefore, he went aft and descended to the shaft tunnel but could not enter the engine room due to the heavy smoke. He returned aft through the shaft tunnel and while proceeding forward on the main deck encountered the junior assistant 2nd engineer and instructed him and a crew member to start the emergency fire pump aft.

40. Approximately five minutes after the explosion the 1st engineer, along with Gregorio Fernandez and Donato, all severely burned, and possibly Raquino, escaped through the shaft tunnel. By the time they reached the main deck level in the aft accommodation house the chief engineer, assisted by the junior assistant 2nd engineer and a crew member, were engaged in starting the emergency diesel fire pump in the steering gear room below the aft accommodation house. At the same time the 1st officer and members of the crew were manning hoses to fight the fire at # 4 and # 5 hatches.

41. The 1st officer was in his office on the promenade deck when the explosion occurred, but was unable to descend the main stairway to the bridge deck or main deck below due to the heat and smoke so he proceeded to the bridge which was also enveloped in heavy smoke within seconds of the explosion. The master directed him to attempt to fight the fire. As the 1st officer left the bridge he discovered several crew members attempting to climb into the lifeboats, some of whom refused to join in the fire fighting and began lowering the lifeboats.[14]

42. The 1st officer proceeded to the main deck aft and ordered crew members

12. Claimants Exh. 5, photos numbered 65 and 66.

13. The Court does not find credible the testimony of the chief engineer that he was able to penetrate the tonnage alleyway and observe the oxygen and acetylene cylinders intact, although he had been unable to effect entry to the engine room space from the bridge deck due to the smoke. It is more likely that he proceeded astern to try and enter the engine room through the shaft tunnel, as he testified.

14. That this incident occurred is not seriously disputed. However, it is not evidence of panic but of a possible conflict of orders. At the time of the explosion two seamen were working at # 5 hatch under the assistant bosun Esquerra repairing the pilot ladder. When the explosion occurred all three ran aft where they met the bosun Liang who directed them to prepare the lifeboats on the boat deck for launching. They went to the boat deck by the outside ladders on the starboard side, and with the assistance of other crew members whom they summoned from forward of the accommodation house they prepared the boats on the port and starboard sides and lowered them. Obviously some crew members had to accompany the boats to the water. Ta Chi Exhs. WWW and XXX, Depositions of Esquerra and Alcedo.

there to connect the fire hose to the port side hydrant just aft of the midship accommodation house. However, there was no water due to the ruptured fire main on the main deck of the house, so the 1st officer went to report this to the master. While proceeding to the bridge, he observed the chief engineer proceeding aft to start the emergency fire pump. When the 1st officer returned from the bridge he observed that water was running through the hoses, and directed the chief engineer and other crew members to connect a second hose on the second port side hydrant. Fighting the fire at # 4 hatch was the bosun, the chief cook, and the chief steward; at # 5 hatch the chief engineer, the 3rd engineer, and the electrician.

43. While officers and crew were fighting the fire at # 4 and # 5 hatches, the vessel shifted in the wind that was blowing the fire and smoke from starboard to port and was forcing the men to retreat to the stern of the vessel, where some were forced to abandon ship via rope ladders at the stern.

44. The remaining crew members had already lowered the four lifeboats into the water, and at least one lifeboat had moved away from the vessel.

45. The fire was now raging throughout the midship accommodation house with fire coming out of the skylight atop and the master directed that the ship be abandoned. The 1st officer assured himself that there were no survivors left aboard ship, and then abandoned ship with those of the crew still aboard. However, the 1st officer kept his lifeboat secured to the burning vessel in the event there were any possible survivors.

46. The vessel was abandoned about one hour after the initial explosion. No further explosions were heard until nearly four hours after the initial one.[15] It is believed that these explosions were caused by chemi-

cals stored in barrels as cargo on the main deck or accommodation house aft. Fire aboard was still visible the following morning.

47. The S.S. Janice L. was sighted around 11:00 p. m. The surviving officers and crew of the S.S. EURYPYLUS were rescued thereafter, and subsequently repatriated. S.S. EURYPYLUS was towed to Long Beach, California where the surviving cargo on board the vessel was discharged.

48. Damage to S.S. EURYPYLUS was concentrated in the midship accommodation house and aft with the heaviest damage to cargo in # 4, # 5 and # 6 holds. Everything combustible in the midship structure was completely consumed. Forward of that structure the damage was slight. There was some fire damage in # 3 hold, but # 2 and # 1 holds were unaffected, and the deck area forward of the midship structure received little damage.[16]

49. Fire damage in the engine/boiler room spaces was concentrated in the upper area except for portions of the boiler room where fuel tanks had ruptured.[17] The maneuvering platform and contiguous areas experienced less fire damage.[18]

50. Hwang, engineering manager of Kee Yeh, was notified of the fire by Transnational Maritime Inc., Ta Peng's agents in the United States, and flew from Taipan to California where he boarded S.S. EURYPYLUS on December 11, 1975. He found hoses connected to hydrants just aft of the midship accommodation house on the port side and forward of the aft accommodation house also on the port side. He also found that the emergency fire pump aft had been operated during the fire. There was approximately 30 feet of water in the engine/boiler room spaces. Two unidentified bodies were found in the engine room workshop; the other two bodies were never located.

15. See note 9 *supra*.

16. Ta Chi Exh. OO, photos numbered 1, 34, 39, 49, 59; Claimants Exh. 5, photos numbered 1–6 incl., 12, 13, 28, 31, 32.

17. Ta Chi Exh. OO, photos numbered 52, 53, 55; Claimants Exh. 5, photos numbered 74–80 incl., 84–86 incl.

18. Ta Chi Exh. OO, photos numbered 51, 56–58 incl.; Claimants Exh. 5, photos numbered 55, 71–74 incl., 82, 83, 87.

51. John F. Connell, claimants' fire expert, boarded S.S. EURYPYLUS on January 14, 1976 and again on February 12 and 13, 1976. Although he did not count the oxygen and acetylene cylinders in the tonnage alleyway, he found that cylinders had ruptured which to him indicated the involvement of those cylinders at the inception of the fire rather than at a later time.

52. Frank Rushbrook, petitioner's fire expert, went aboard S.S. EURYPYLUS on February 11–13, 1976. He found twenty to twenty-four gas cylinders in the port tonnage alleyway. Petitioner has offered no evidence to explain the presence of these cylinders other than the seven oxygen and two acetylene cylinders hereinbefore referred to.

53. Oxygen and acetylene are each highly inflammable and, under pressure, highly explosive. Although there is no evidence as to the pressure of the oxygen cylinders, the acetylene cylinders were under a pressure of 264 pounds per square inch. Cylinders containing these gases are explosive when exposed to heat or shock. In combination oxygen and acetylene gas produce an intense flame of approximately 6000° F, the hottest of all commercial fuel/gas/oxidant combinations.

54. Although neither Lloyds nor SOLAS specifically prohibited the stowage as ships' stores of oxygen and/or acetylene in space such as the port tonnage alleyway of S.S. EURYPYLUS, there is British authority with respect to the carriage of inflammable gases as cargo. "Carriage of Dangerous Gas in Ships," British Department of Trade and Industry (The Blue Book) Section 8–A of main Section 2 provides that:

Poisonous and inflammable gasses, unless otherwise recommended, should be accepted for carriage on deck of cargo ships only. Receptacles for such gasses should be kept as cool as reasonably practicable during transit and should be stowed away from all sources of heat and sources of ignition. Leaking gas should be prevented from penetrating to any other part of the ship. The stowage should be arranged at all times so that

gasses of Class 2 are kept separated from oxidizing substances. Inflammable gasses must at all times be stowed away from living quarters.

The Blue Book further describes acetylene as a dissolved gas, explosive with about 2 percent to 80 percent in air, and as an inflammable gas with a slight odor, slightly lighter than air (0.9). As for stowage, "Shade from radiant heat. Stow away from living quarters, on deck, in an area not accessible to unauthorized persons." (T. 329–331). Oxygen must be stowed in a well-ventilated place away from organic materials on or under deck. (T. 441).

United States cargo vessels are subject to Coast Guard regulations, 46 C.F.R. § 147.-05–100, regarding the carriage of oxygen and acetylene as stores or ships' equipment. These regulations are not applicable to foreign cargo vessels, although such foreign vessels are subject to inspection at United States ports if they carry passengers. The regulations require stowage of acetylene in a cool ventilated location selected and supervised by the chief engineer, with the knowledge and approval of the master, protected from temperatures exceeding 100° F. (T. 640–641). Furthermore, the Coast Guard limits the amount of acetylene that can be carried by a U.S. flag cargo ship to 600 cubic feet. (T. 719).

Regulations governing the carriage of acetylene and oxygen as stores on German cargo ships are issued by SEE-BERUFSGE-NOSSENSCHAFT. Its Accident Prevention Regulations (Claimants Exhs. 21, 22) permit the storage of steel cylinders containing oxygen or acetylene "in specially prepared spaces on the uppermost continuous deck provided they are protected against the continuous effect of heat, especially from solar radiation." (Claimants Exh. 21, § 88(2), p. 50). Also, "bottles and other portable vessels must be accommodated in special, non-combustible, lockable and thoroughly ventilated lockers or shelters." Id. (T. 695–696).

There are further regulations which prohibit storage "in or next to engine or boiler rooms or in other locations inside the ves-

sel" and further prohibit the storage of more than four cylinders together." (T. 698).

The Norwegian Safety Board as represented by DET NORSKE VERITAS forbids stowage within the superstructure. (T. 700).

55. The stowage of acetylene gas cylinders under pressure should be in a well-ventilated space away from sources of heat or ignition, away from living quarters, and separated from oxidizing substances such as oxygen gas. In view of the construction of the port tonnage alleyway of S.S. EURYPYLUS and the location of the cylinder rack, it is difficult to conceive of the acetylene or oxygen gas cylinders as having been stowed in a well-ventilated space. It is impossible to find that, with the open engine room door a few feet away, they were away from sources of heat or ignition, or that with living quarters above and abutting them, they were stored away from living quarters. Engine room fires are not uncommon aboard ships. That oxygen and acetylene were stored in the same rack has not been seriously disputed. Nor does any authority cited to the Court countenance the storage of unsecured gas cylinders, or the storage, unsecured and secured, of twenty to twenty-four gas cylinders in a 4 foot wide alleyway containing the remote controls or vitals of the ship's primary fire control systems.

56. Definitions regulating tonnage measurements are not definitive with respect to safety regulations. The storage of acetylene and oxygen cylinders in the port tonnage alleyway was within the living accommodations of S.S. EURYPYLUS.

57. A fire in the engine room could reasonably be expected to involve the port tonnage alleyway. The alleyway contained the only remote controls to the steam smothering system effective while the ship was at sea. That system would have been operational for a period of time after the main boilers were shut down. The alleyway also contained a portion of the main fire line which was ruptured by the explosion. The main controls for that fire-fighting system were located a deck above the alleyway. In addition to controls for the fire-fighting system, the automatic closing devices for the fuel oil tanks and for closing the shaft tunnel door were also located in the port tonnage alleyway.

58. Hwang, the engineering manager of Ta Chi's agent Kee Yeh, an alter ego of Ta Chi, was fully cognizant of the oxygen and acetylene cylinders stored in the rack in the port tonnage alleyway and was aware, or should have been aware, of the additional cylinders for which no fixed storage was provided. It was customary at the conclusion of a voyage, or in port during a voyage, to replace empty cylinders by returning them for refilling. Ta Chi has not attempted to explain the presence of the oxygen or acetylene or freon cylinders other than the oxygen and acetylene cylinders taken aboard at Keelung.

59. Hwang was also on notice of the open doorway to the engine room in the port tonnage alleyway. It is not disputed that this door was always open. Hwang was aboard the ship during the initial part of the voyage and observed the cylinder rack adjacent to and across the alleyway from the doorway. He made frequent inspections of the engineering spaces during the period when the ship was owned by Ta Chi.

60. The stowage of the oxygen and acetylene gas cylinders at the location and in the manner so stowed at the commencement of the voyage, and the presence of the additional cylinders for which no permanent stowage was provided, together with the foreseeability that in the event of fire in the engine room the cylinders would explode and destroy or seriously impede the ship's fire-fighting capability, were within the privity and knowledge and resulted from the neglect of the shipowner, Ta Chi.

61. Under the circumstances hereinbefore described, the emergency diesel fire pump, which was operational, was activated within a reasonable time after the explosion and ensuing fire. Any delay in its activation was not due to mechanical fault or negligence, nor was such delay, if any, a

contributing factor in the cargo loss involved herein.

62. The officers and crew of S.S. EURYPYLUS were trained adequately in firefighting and lifesaving procedures. Under the circumstances existing they performed creditably.

## DISCUSSION

When judges go down to the sea in ships in cases such as this, the voyage is over and the damage, whether it be to ship, or cargo, or crew, is all a part of that voyage. Therefore, the Court must determine from the testimony or depositions of fact and expert witnesses, from pertinent documents, and with due respect for applicable legal authority, what caused the loss or damage and where the legal fault lies.

There are cases, unfortunately, where there are few, if any, witnesses to a maritime disaster or where a foreign vessel is involved and the foreign officers and seamen testify by deposition at an early stage of pretrial discovery when the real issues have not yet been developed. And when a serious maritime disaster occurs, there is the likelihood that relevant documents such as log books are lost in the disaster. This was the case with S.S. EURYPYLUS.[19]

First we must consider the applicable statutes, primarily the Fire Statute, passed by Congress in 1851, 46 U.S.C. § 182, and the COGSA Fire Exemption, 46 U.S.C. § 1304(2)(b), passed in 1936.

The Fire Statute of 1851 provides:

§ 182. *Loss by Fire*

No owner of any vessel shall be liable *to answer for or make good to any person* any loss or damages, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of *any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."* [Emphasis added].

COGSA §§ 1301(a), 1303(1) and (2), and 1304(1) and (2) provide in pertinent part:

§ 1301. *Definitions*

\* \* \* \* \* \*

(a) The term "Carrier" includes the owner or the charterer who enters into a contract of carriage with a shipper.

\* \* \* \* \* \*

§ 1303. *Responsibilities and liabilities of carrier and ship*

### *Seaworthiness*

(1) The carrier shall be bound, *before and at the beginning of the voyage*, to exercise *due diligence* to—

(a) *Make the ship seaworthy*;

(b) *Properly man, equip, and supply the ship*;

(c) *Make the holds*, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, *fit and safe for their reception, carriage and preservation.* [Emphasis added].

### *Cargo*

(2) The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

\* \* \* \* \* \*

---

19. The Chinese and Filipino officers and crew were repatriated shortly after their rescue. None appeared as live witnesses. The depositions of the injured 1st engineer and injured crew members Donado and Fernandez were taken in San Diego, Calif., December 11 and 12, 1975. The other crew members deposed, *i. e.*, Serna, De La Cruz, Alcedo, and Esquerra were deposed in Manila, August 18 and 19, 1977. The depositions of the chief steward and various officers were taken in New York September 26–October 6, 1977. The master was never deposed. The only live witnesses were expert witnesses, some of whom had actually examined the ship after the explosion and fire, or had some previous familiarity with the ship. The deck logs were accidentally lost when the master went into the sea while abandoning ship. The engine room logs were lost in the fire. Much additional evidence regarding fire and safety information was likewise destroyed in the fire. Pretrial discovery focussed on the training of the crew and the efficiency of the emergency fire pump, and was pursued at trial despite any showing of a significant causal relationship of such training or efficiency to cargo, loss or damage.

## § 1304. *Rights and immunities of carrier and ship*

### *Unseaworthiness*

(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from *unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied,* and to make the *holds,* refrigerating and cooling chambers, and all other parts of the ship *in which goods are carried fit and safe for their reception, carriage, and preservation* in accordance with the provisions of paragraph (1) of section 1303 of this title. *Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier* or other persons claiming exemption under this section. [Emphasis added].

### *Uncontrollable causes of loss*

(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

\*    \*    \*    \*    \*    \*

(b) Fire, *unless caused by the actual fault or privity of the carrier.* [Emphasis added].

### *Burden of Proof*

■ In cases involving the fire exemption statutes the allocation of burden of proof has been somewhat confused by the type of action, the order of proof, and the nature of the causal unseaworthiness. *In an action in rem or in personam by cargo against the carrier,* cargo can make a prima facie case against the carrier by showing by a bill of lading that the carrier received the cargo in sound condition and failed to deliver, or delivered it in a damaged condition. The burden of proof is then on the carrier

to show that it exercised due diligence, *i. e.,* seaworthiness or freedom from negligence. It is here that the nature of the causal unseaworthiness becomes vitally important. COGSA mandates that: (1) The carrier shall be bound, *before and at the beginning of the voyage,* to exercise due diligence." (Emphasis added).

■ If the carrier did not "exercise due diligence" before and at the beginning of the voyage then it may not invoke the exemptions of the fire exemption statutes if the failure to "exercise due diligence" was related causally to the fire or the extinguishment of that fire. The carrier bears the burden of showing lack of design or neglect, fault or privity. *Sunkist Growers, Inc. v. Adelaide Shipping Lines Ltd.,* 603 F.2d 1327 (9th Cir. 1979), *cert. denied,* 444 U.S. 1012, 100 S.Ct. 659, 62 L.Ed.2d 640 (1980) *(The Gladiola); Asbestos Corp. Ltd. v. Compagnie de Navigation Fraissinet et Cyprien Fabre,* 345 F.Supp. 814 (S.D.N.Y. 1972), *aff'd,* 480 F.2d 669 (2d Cir. 1973) *(The Marquette* ).[20] It follows that if the carrier did exercise the due diligence mandated by § 1303 and fire damaged the cargo due to an unseaworthy condition or unforeseeable negligence arising *in the course of the voyage,* then the carrier can invoke the fire exemption statutes and the burden is on cargo to show that such damage was due to the personal "design or neglect" or the "fault or privity" of the carrier.

■ *In a proceeding for exoneration from, or limitation of, liability* (as is the present proceeding) the petitioner is required to prove that the vessel was seaworthy at the commencement of the voyage and to set forth facts known to it which might have a bearing on the cause of loss. The cargo claimants have the burden of proof of establishing either unseaworthiness or negligence causally related to the loss or damage. If such unseaworthiness or negligence is established the petitioner must

---

**20.** The lower court decision in *The Gladiola, i. e., Sunkist Growers, Inc. v. Adelaide Shipping Lines Ltd.,* 1976 A.M.C. 2597 (N.D.Cal.1976), was relied upon by Ta Chi in its post-trial brief to impose on cargo the burden of showing

personal privity of the carrier. The lower court relied on dicta in *The Marquette* which has caused some confusion, as pointed out in *The Gladiola,* 603 F.2d at 1335–36.

then show that it is entitled to limitation or exoneration because of a lack of privity or knowledge as to the condition of unseaworthiness or negligence. *In re Marine Sulphur Transport Corp.*, 312 F.Supp. 1081, 1092 (S.D.N.Y.1970), *aff'd in part, rev'd in part sub nom. In re Marine Sulphur Queen*, 460 F.2d 89 (2d Cir. 1972) (The Marine Sulphur Queen). If the petitioner failed to use due and proper care, *i. e.*, due diligence, to provide a competent master and crew and to see that the ship was seaworthy at the commencement of the voyage, then any loss occurring by reason of fault or neglect in these particulars is within its privity, and it may not avail itself of the fire exemption statutes. *Tug Ocean Prince Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir. 1978) (Tug Ocean Prince); *The Gladiola, supra*, 603 F.2d at 1341. Conversely, if petitioner did exercise the due diligence mandated by § 1303, then the burden falls on claimants to show that the damage was due to the personal "design or neglect" or "fault or privity" of the petitioner. *Complaint of Caldas*, 350 F.Supp. 566, 573 (E.D.Pa.1972), *affirmed without opinion sub nom. Appeal of Coldemar Line*, 485 F.2d 678 (3d Cir. 1973).

In the instant case we are concerned with whether the carrier had exercised due diligence under § 1303 before and at the commencement of the voyage to make S.S. EURYPYLUS seaworthy, to properly man, equip, and supply her, and to make her holds fit and safe for the reception, carriage, and preservation of cargo.

*Unseaworthiness*

█ The term "seaworthiness" is a comprehensive one. In the simplest sense, it means the reasonable fitness of the ship for her intended use. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). Such fitness encompasses not only the ship herself but those who man her. The shipowner or carrier is chargeable when it has failed in its duty to exercise due diligence, and has provided a vessel unseaworthy in some respect that proximately contributes to the loss. Gil-

more & Black, *The Law of Admiralty*, 2d Edition, pp. 810–20, 877–78 (1975). The claimants of course must show that the unseaworthiness was causally connected with the damage to cargo.

█ In cases involving damage by fire "the design or neglect" or "the actual fault or privity" of the owner or carrier, as well as the failure to exercise due diligence, may be established through the acts or omissions of managing officers and agents of corporate owners or carriers.[21] Furthermore, the failure to exercise due diligence to make the ship seaworthy and to properly man her before and at the beginning of the voyage deprives the carrier or shipowner of the exemptions of the Fire Statutes if such unseaworthiness or failure to properly man the ship causes the fire damage, either by starting the fire *or by preventing its extinguishment. The Marquette, supra*, 480 F.2d at 672; *In re Liberty Shipping Corp.*, 509 F.2d 1249, 1251 (9th Cir. 1975).

█ The determination of seaworthiness is to be made by the court based on all the relevant circumstances developed from the testimony or depositions of witnesses, the opinions of expert witnesses, relevant documents and photographs, and related principles of reasonable safety precautions applicable to the shipping industry. Certification by a classification society, by a foreign government, or pursuant to SOLAS does not, in itself, establish the seaworthiness of the ship nor does it satisfy the obligation of due diligence, since the shipowner's duty to provide a seaworthy vessel is nondelegable. *The Marquette, supra*, 345 F.Supp. at 819; *Federazione Italiana Dei Corsorzi Agrari v. Mandash Compania de Vapores, S.A.*, 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968). However, such certifications must be considered by the court along with all the other evidence, and given such weight as the particular certification is entitled to, with consideration of course to its date and relevance to the main issues.

The principal charges of unseaworthiness in the instant case are focused on the fire-

---

**21.** *See, e. g., Coryell v. Phipps*, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943).

fighting fitness of the officers and crew of S.S. EURYPYLUS, and the fitness of fire-fighting equipment. The petitioner is further charged with failure to exercise due diligence to make the ship seaworthy at the commencement of the voyage.

*The Explosion*

As hereinbefore indicated the Court has concluded that the fire was caused by the explosion of an accumulation of acetylene and/or oxygen gas in the engine room spaces which in turn triggered the explosion or ruptured cylinders of those gases secured and unsecured in the port tonnage alleyway. The Court is in agreement with the opinion of claimants' expert in this regard.

This is not a case where the Court is faced with "two or more equally possible causes of an explosion" where the fact finder is left "to choose one of the possibilities by guess and conjecture." *Universe Tankships v. Pyrate Cleaners*, 152 F.Supp. 903, 920 (S.D.N.Y.1957); *Complaint of Caldas, supra*, 350 F.Supp. at 573. Although this Court has high respect for Mr. Rushbrook, petitioner's expert, it rejects the theory that the initial explosion was caused by a fuel oil leak at # 1 generator. The 1st engineer testified that the # 1 generator was still running after the main explosion. While this does not exclude the possibility of a fuel oil leak, it is highly unlikely that there would be an absence of fire at the generator. Moreover, the generator had been inspected by the chief engineer a few hours before the explosion and found to be in good order, and there is no testimony by anybody who was in the engine room that day that any difficulty had been experienced with either of the operating generators. The # 2 generator, which had experienced mechanical difficulties on the prior voyage, was on standby.

The explosion originated at or above the third level according to a preponderance of the testimony of the witnesses. Initially the heaviest fire was around the fourth or main deck level. Furthermore, that the heaviest damage in the engine room due to explosion was above the third level, the burns suffered, and the fact that in at least one instance a man's hair was set on fire, all support an explosion in the upper, rather than the lower part of the engine room.

The implication of oxygen and acetylene gas in the initial explosion as opposed to a vaporization of fuel oil at the # 1 generator finds support by a preponderance of the credible evidence. It is clear that circumstantial evidence combined with common sense and expert testimony may establish the cause of fire. *Minerals & Chemicals Philipp Corp. v. S.S. National Trader*, 445 F.2d 831, 832 (2d Cir. 1971); *United States v. Standard Oil Co.*, 495 F.2d 911, 916 (9th Cir. 1974). We know that prior to November 10th the oxy-acetylene system had been used for repair work on the hawse or chain pipe on the forward deck and that this use had exhausted all but one of the seven (or more) oxygen cylinders aboard. We know that the chief engineer was peculiarly concerned with the valves on the cylinder heads, although there were three valves at the torch end of the hoses in addition to the valve at the cylinder head itself which normally had to be opened before the oxy-acetylene gas could be discharged from the torch. This implies that he was concerned with the integrity of the hoses. We know that the chief engineer on his last trip to the engine room had instructed those in the workshop to "get everything ready," and we know that the fitter normally would be the one to open the valves on the cylinders. We also know that whatever was ignited in the engine room space was sufficiently volatile to inflict flash burns on exposed personnel in the engine room and create heavy smoke in those areas where it did not cause fire.

In the light of the foregoing and claimants' expert's opinion, it would appear more than a mere probability that a leakage from the hoses in the oxy-acetylene system created the source of the initial triggering explosion. The Court agrees that leakage from the cylinder heads was highly unlikely, and that leakage from the torch end is not supported by the evidence. The torch was found in the workshop after the disaster. Whether it was tested outside the workshop

prior to the explosion is a matter of conjecture. However, what is not a matter of conjecture is that the explosion was initiated by oxygen and/or acetylene gas in the engine room space. It is supported by reasonable inferences from the available evidence, as opposed to the only alternative posited, i. e., the vaporization of fuel oil from #1 generator in the lower area of the engine room.

Of course, neither an accumulation of oxy-acetylene gas from leaking or disrupted hoses nor vaporized diesel fuel from the #1 generator, was due to the design or neglect or the fault or privity of Ta Chi. There is no evidence to support a finding that the oxy-acetylene system or the #1 generator was in any way defective at the commencement of the voyage.

We come then to the source of ignition of the initial explosion. The Court has concluded that the source was electric sparks from the main electrical switchboard which ignited the oxy-acetylene gases rather than hot steam pipes which ignited vaporized diesel fuel. What caused the failure at the main electrical switchboard is not known. We do know that the 1st engineer saw a lightning flash some four seconds before the explosion and that he was not burned until the explosion. The Court believes, but does not find, that the flash emanated from the workshop. Here again, the Court is hampered by a lack of evidence. All of those who might have disclosed the source of the mechanical failure, i. e., the crew members in the workshop, are dead. Whether they died from smoke inhalation, fire, or other causes is not known. There is not a scintilla of evidence about them after the explosion, although they occupied the most protected section in the engine room.[22]

Yet here again, absent competent evidence, the condition of the main electrical switchboard or any agency which caused its failure is not chargeable to the design or neglect or the fault or privity of Ta Chi.

We arrive, then, to the Achilles' heel of S.S. EURYPYLUS, i. e., the oxygen and acetylene cylinders secured in a rack in the port tonnage alleyway a few feet from the door to the engine room, and the presence of an equal or greater number of cylinders situated in that area and unsecured.

The evidence makes clear that the oxygen and acetylene cylinders exploded almost simultaneously with the explosion of gas in the engine room space. There is an abundance of evidence that there was only one heavy explosion at the time of the inception of the fire. The fire raged through the midship accommodation house for at least four hours before further explosions were heard. These explosions were attributed to chemical drums stored aft or on the bridge deck.

Structural damage in the accommodation house was practically instantaneous. The chief steward had just entered the officers mess room on the bridge deck aft when he observed flames shooting up through a large hole in the mess room deck. He was unable to escape forward along the port passageway because the shattered bulkheads in that passageway above where the gas cylinders were stored had blocked his exit and compelled him to escape through the shattered windows of the mess room. De La Cruz, an able seaman who was on the navigation bridge four levels above the engine room, stated that the whole vessel shook. The main force of the explosion which ruptured and tore holes in the engine room casing was inboard, consistent with an explosion of the gas cylinders. Claimants' fire expert was of the opinion that an explosion of oxy-acetylene gas in the engine room simultaneously ignited and exploded

22. None of the parties called an expert electrician, nor were pictures introduced of the main electrical switchboard either aboard S.S. EURYPYLUS or aboard a sister ship. There was evidence of previous electrical failures, together with evidence locating the initial explosion in the immediate vicinity of the switchboard. The lightning flashes preceding and accompanying the initial explosion suggest an electrical failure. The possibility suggests itself that an electrical failure occurred in the workshop while the electrical welding system was in operation which electrocuted one or more of the men there and in turn shorted the main switchboard.

the gas cylinders in the port tonnage alleyway. As hereinbefore stated the Court so finds.

One further factor relative to the explosion of the cylinders must be considered, that is, the open door leading from the port tonnage alleyway into the engine room. There is unchallenged evidence that this door was always kept open, in effect making the port tonnage alleyway a part of the engine room.[23] The explosion of oxy-acetylene gas exiting through this opening in the casing would have had a blowtorch effect on the oxygen and acetylene tanks stored in the immediate vicinity.

The Court concludes that a similar blast of superheated gases swept through the door in the after bulkhead of the engine room which led into the refrigeration machinery room. This blast caused the flaming hole in the mess room deck above the machinery room, the hole observed by the chief steward immediately after the explosion.[24]

Windows were shattered at least as high as boat deck level, and the whole vessel shook. The main force of the explosion was inboard and horizontal, as evidenced by the casing in the port tonnage alleyway. In the larger area of the engine room there was less explosive effect. Those who survived did not report that they had been felled by any blast—their injuries were confined to flash burns. There was comparatively little blast damage in the engine/boiler room spaces below main deck level, with the fire damage concentrated in the upper and particularly the lower levels of the boiler room space.

There is no question in the Court's mind that the stowage of the oxy-acetylene cylinders in the port tonnage alleyway rendered S.S. EURYPYLUS unseaworthy at the commencement of the voyage. This condition was exacerbated by the open door to the alleyway, and by loose unsecured gas cylinders in the alleyway—both of which were there by the personal "design and neglect" and with the personal "privity or knowledge" of Ta Chi. Hwang and Ho, the engineering manager and port engineer of Ta Chi's agent Kee Yeh, were aboard the ship at Keelung. Hwang reported that they had observed the gas cylinders in the rack. Indeed Hwang was aboard on the first portion of the voyage, and he and the port engineer should have observed the open door to the engine room. Ta Chi has offered no evidence to explain the presence of the additional gas cylinders or to show that they were securely stowed. Nor has it rebutted in any way the evidence that the engine room door was always kept open.

The cylinders could hardly have been stored in a more critical area of the ship. Above them along the alleyway overhead ran the ship's water main, other piping, and electrical cables.[25] The water main was breached by an exploding cylinder. A few feet from the cylinders were the remote controls for the engine room steam smothering system. They were inaccessible due to fire. Above the cylinders on the bridge deck was the ship's water command system. It was inaccessible due to bulkhead destruction in the bridge deck port passageway. Following the explosion of the gas cylinders the fire-fighting capability of the ship was sustained solely by the emergency fire pump aft and such portable fire extinguishers as were available.

23. Ta Chi Exh. TTT, Deposition of Hsu, p. 175; T. 290. It is not claimed that the oxy-acetylene cylinders would not have exploded had the engine room door been closed. No evidence was offered to support or dispute such a claim. Conceivably the explosion might have been delayed had the door been closed.

24. This hole, described as over one foot in diameter, was attributed to stress by one expert, to shrapnel from a cylinder by another expert. At the time of such attribution Ta Chi Exh. YYY, which divulged the existence of the door

in the after bulkhead, had not been introduced in evidence. Since the hole does not conform to stress damage, and penetration by shrapnel appears unlikely in view of the location of the hole, the Court concludes that it was caused by superheated gas, probably the gas from the exploding tanks which blew in the engine room casing rather than the gas initially ignited in the engine room.

25. Ta Chi Exh. OO, photos numbered 17–24 incl.

Ta Chi suggests that the oxygen and acetylene cylinders did not contribute to the fire and did not explode until four hours or more after the explosion. Ta Chi's Post-Trial Brief, p. 10. For the reasons already set forth, the Court has concluded otherwise.

Ta Chi also claims that such stowage did not violate any applicable rule or regulation of England or of Lloyds although it admits that no specific location for stowage of such ships' stores is specified except: "Shade from radiant heat. Stow away from living quarters, on deck, in an area not accessible to unauthorized persons." The Blue Book.

However, it is claimed that if the cylinder rack in its present location was part of the original approved design of the ship, subsequent surveyors would approve it, particularly Lloyds surveyors. Although the Court is not convinced that the cylinder rack was a part of the original design of the ship, this is beside the point. Ta Chi has not shown that any British or Lloyds regulations specifically permitted the storage of oxygen and acetylene cylinders as ships stores in the location indicated on the original general arrangement plan of the ship, nor did that plan identify or show any rack or the purpose of the rack. The rack and its identification obviously were added after the original plan was prepared.

Neither does Panamanian law dictate the storage of the gas cylinders. Helmut Schnitger, an independent surveyor called by claimants, testified that were he to survey S.S. EURYPYLUS he would not approve such stowage because the international standard is that oxygen and acetylene cylinders are not to be stored or stowed within the accommodation area. (T. 693).

As already noted, the only British regulation, supra, requires stowage shaded from radiant heat, "away from living quarters, on deck, in an area not accessible to unauthorized persons." While the cylinders may have been stowed on open deck within the meaning of the tonnage regulations, what we are dealing with is safety, not canal tonnage tariffs. The tonnage alleyway was within the interior of the accommodation house. Forward the alleyway terminated in a door, aft it terminated in switchboards or sliding boards, i. e., one inch wooden planks. Because the door forward was not a watertight door, and because the wooden planks aft were not "permanent" under tonnage regulations this alleyway became "open deck" available for on deck stowage of cargo. What makes this even more incongruous is that the port tonnage alleyway was not exposed to the weather throughout its genesis at the doorway forward to the closed-in exit aft in the housing for the winches serving # 4 hold. This housing ran from port to starboard across the full beam of the ship. On the inboard side of this alleyway was the engine/boiler room with its reinforced steel casing, machinery space and enclosed cargo space. On the outboard side of the alleyway were living quarters, protected by a steel bulkhead which was not reinforced, and the living quarters were in turn partitioned by wooden bulkheads.[26] The British regulations require stowage "away from living quarters." The German and Norwegian regulations (Finding 54) are even more stringent. While S.S. EURYPYLUS may not be controlled by other than British regulations by reason of her original flag, the regulations of other nations are relevant.

It is significant that such stowage was not a consistent practice of Ta Chi. Hwang testified that on some of Ta Chi's ships such stowage was in a locker on deck or in the steering gear room.[27] None of the parties involved herein questions the dangerous propensities of acetylene or oxygen. Moreover, there is no authority on earth which has been cited to this Court that would countenance stowage as ship stores of twenty to twenty-four gas cylinders, secured and unsecured, in the confined area involved herein.

It is impossible to find under the circumstances of this case that the cylinders of

---

**26.** T. 685–690.

**27.** Ta Chi Exh. YY, p. 26.

acetylene and oxygen were properly stowed "away from living quarters." Furthermore, as already indicated, such stowage was in an extremely vulnerable area, at least insofar as fire control was concerned. The ship's fire main ran directly above the cylinder rack with the water controls one deck above. In addition to the remote controls for the steam smothering system from the main boiler system, also located there, were the remote controls to the quick-closing valves of the fuel oil tanks, the pump for closing the shaft tunnel door, and freon pipes running from the refrigeration machinery room to the refrigerated spaces. If the cylinder rack was properly located where it was, then these valves and remote controls were not. In either event S.S. EURYPYLUS was unseaworthy at the commencement of the voyage.

Although, in the light of this Court's determination as to the unseaworthiness of S.S. EURYPYLUS, consideration of the further claims of unseaworthiness would appear academic, the Court will discuss and determine them since they are the principal claims advanced.

*Fire-fighting capability of the officers and crew*

In reaching his conclusion that the crew evidenced a lack of training in fire fighting and in fire safety generally, claimants' fire expert Connell based his opinion on the depositions of certain Filipino crewmen that they had had no fire drills since Ta Chi took over S.S. EURYPYLUS and upon the testimony of the chief engineer as to the time required to start the emergency fire pump on November 10, 1975.

With respect to the testimony of the Filipino crew members: the fireman Donato and the oiler Fernandez were both injured in the fire and had personal injury claims against Ta Chi; Serna, De La Cruz, Alcedo, and Esquerra were all friends of Fernandez and/or Donato and had been asked by Fernandez or Donato to testify on their behalf. Opposing their testimony that there were no fire drills and the implication that Ta Chi, unlike the prior Greek owners, was indifferent to fire-fighting training

and fire safety generally, is the uncontroverted evidence by all the officers and other persons who were deposed that the master and chief engineer had been briefed on fire-fighting training and safety before joining S.S. EURYPYLUS and had been directed by Ta Chi to conduct lifesaving and fire-fighting drills at least once a month in accordance with SOLAS requirements and that these drills were conducted at least monthly as ordered. Lifeboat and fire-fighting stations were permanently displayed on the bulkhead in the passageway outside the main dining saloon, and each officer and crew member had a fire and boat station assignment posted in his cabin or quarters. Also a plan, similarly posted, set forth the precise location of each piece of fire-fighting apparatus and lifesaving equipment on the ship. In the engine room there was a chart indicating the locations of fire-fighting equipment in the engine room spaces. Each of the officers aboard received fire-fighting training while attending Taiwan Maritime College before obtaining his license as an officer. After the first voyage Hwang, the engineering manager of Kee Yeh, reviewed the log book and noted the entry of monthly fire and lifeboat drills during that voyage, and on the final voyage a fire and lifeboat drill was held a few days after leaving Japan and less than three weeks prior to November 10, 1975. Furthermore, there is abundant proof of inspections of fire-fighting equipment prior to and during the voyage in question. Accordingly, the Court finds that Ta Chi reasonably carried out its responsibility for proper fire-fighting training for the officers and crew. *Complaint of Caldas, supra,* 350 F.Supp. at 573–74.

Furthermore there has been no showing of causation, even were the Court to find neglect of fire-fighting training on the part of Ta Chi or its agents.

The proper question is whether under the peculiar circumstances of this case a well trained crew could have prevented or reduced the fire damage to cargo. If the answer is negative then a failure to train would be irrelevant unless we are to assume

that an untrained crew is more effective than a trained crew.

Let us consider first the crippling effect of the explosion insofar as personnel was concerned. At the time of the explosion there were ten officers and crew in the engine room, all members of the engineering department, either on the 12:00–4:00 watch, on day watch, or on overtime. This group consisted of four engineering officers, one oiler, one fireman, one wiper, and the fitter, all on duty, and one fireman and perhaps one oiler on overtime painting. In other words, of the six officers in the engineering department four were in the engine room at the time of the explosion. Only the chief engineer and the junior assistant 2nd engineer were left to control the fire from outside the engine room spaces. Of the four officers in those spaces, two were killed and the other two injured. Of the six crew members, the fitter and one wiper were killed, one oiler and one fireman were injured. Assuming Serna was present the only two crew members to escape unscathed were Serna and Raquino, oiler and fireman respectively, who were not on duty but painting on overtime.

Not only was the available fire-fighting force in the engine room diminished by death or injury, but the fire-fighting options were restricted both within and without that space. The use of the steam smothering system, even if the controls were accessible, could not be used in the engine room while the possibility of personnel alive in that space still existed. The main fire pumps in the engine room space were electrically driven and all electricity was gone. The fire main in the tonnage alleyway was ruptured and the water control system on the deck above was inaccessible. Water was, therefore, available only through the diesel emergency fire pump

aft. All electric illumination other than by flashlights was lost, as was the electrical ventilation system, so that the engine room and the amidship accommodation house above were filled with impenetrable smoke.

Inferences as to panic on the part of certain members of the crew are not warranted. The launching of the lifeboats shortly after the explosion was entirely proper. The lifeboats represented the only hope of survival of the crew and were seriously endangered by the fire spreading through the superstructure. The correct place for the boats was in the water alongside. It is true that some boats left the ship's side prematurely. All living survivors were safely debarked hours before any rescue vessel arrived.[28] From the evidence it appears to this Court that the officers and crew, in a position to fight the fire, did so with courage and perseverance in a cause which was lost before they realized what had occurred. While they were myopic in recognizing the acute safety risk inherent in the stowage of the oxy-acetylene cylinders, the fault lies with the shipowner, not with the crew.

### Defects in fire-fighting equipment

Claimants still persist in their charges of a defective emergency fire pump, improper and missing hose nozzles and hoses, and improper maintenance of equipment. These charges can be resolved relatively easily. To the extent that they are based on photographs taken two or three months after the disaster which disclose valves with handles missing, or an absence of hoses or nozzles aboard, and the like, the Court observes that the few photographs taken at least a month earlier suggest the unauthorized removal of equipment from the ship following the disaster and before the ship's

---

**28.** The time the ship was abandoned is not completely clear. From the masters Sea Protest, it would appear that decision was reached approximately one hour after the explosion and "after a short discussion with Chief Engineer and Officers." Ta Chi Exh. A. This is not borne out by the record. The 2nd officer stated he left the ship 40–45 minutes after the explo-

sion. At that time lifeboat # 3 was far from the ship and the 2nd officer called back lifeboat # 1 which was leaving the ship. Ta Chi Exh. SSS, Deposition of Liu, pp. 26, 33. It would appear that the lifeboats were lowered within 10 minutes of the explosion and that at least one lifeboat with injured personnel left within 30 minutes of the explosion.

removal from California for scrapping.[29] The established fact is that the ship's equipment met safety requirements. No officer or crew member testified that any specific equipment was missing, only that it was inaccessible because of the fire.

As for the emergency fire pump, it is clear that it was in operation as promptly as possible under the circumstances, and that no mechanical difficulties were encountered.[30] If, in fact, it and/or the hose was not suitable for spray or fog nozzles which are used in engine room fires, in this case it was used, unsuccessfully, to fight fire in wooden hatch covers, not to fight the engine room fire which was inaccessible. It is not denied that there were fog or spray nozzles and hoses in the engine room.

Claimants' charges of unseaworthiness by reason of a lack of training in fire fighting or defects in fire-fighting equipment are not supported factually. More important is the absence of causation, either complete or substantial in either case. After claimants' expert Connell had completed his testimony and claimants rested, the Court addressed two questions to Connell and received the following answers:

THE COURT: I might ask one or two questions.

I take it from the past testimony that so far as the auxiliary fire pump is concerned and any [latent] or patent defects in connection with that, in the light of this particular fire and explosion which created practically a blowtorch explosive effect in the upper part of the engine room, that nothing could have been done, even by a trained crew, after about two minutes?

THE WITNESS: Yes, your Honor, you are right.

THE COURT: And that you felt that a trained crew could have or should have put in operation the auxiliary fire pump in five minutes. So I take it that the failure in this case insofar as the auxiliary fire pump was concerned was not a contributing cause or a cause of the particular loss involved? Is that your opinion?

THE WITNESS: Yes, your Honor.

With respect to the causation factor and the firefighting capability of the crew, Connell was asked the following questions and gave the following answers:

Q You have given a long description with respect to the fire and the explosion as described by the crew. Do you have an opinion as to whether or not this fire could have been successfully fought?

A Yes, I do.

Q What is your opinion, and why?

A I think that the nature of this fire and explosion, considering all the evidence that I saw myself and that I read, was such that virtually from its inception—first of all, I don't think this crew could have fought—certainly not have dealt with this fire, but I doubt very much that any crew could have after the first few minutes.

Q Why?

A Because the fire, in my opinion, originated in acetylene gas, it started

29. Ta Chi Exhs. HH, II and JJ, photos by Hwang taken in early December 1975; Ta Chi Exh. YY, Deposition of Hwang, pp. 40–45 incl. There was also evidence that the emergency fire pump had been tampered with after Hwang's visit. *Id.* pp. 48–50 incl. Although Hwang employed guards for the cargo at one boarding ladder and at # 3 hatch, there was some unauthorized removal of material. *Id.* pp. 111–114.

30. The Court does not accept claimants' contention that the remote control to the sea suction valve was broken before the commencement of the voyage or prior to the explosion and fire. Nor is there evidence in any event that it caused any delay in activating the emergency fire pump. Furthermore, if the 1st engineer is correct in estimating that he left the engine room five minutes after the explosion accompanied by Donato and Fernandez, both of whom were burned, there is testimony that they arrived on the main deck aft via the shaft tunnel at the time the emergency fire pump was already in operation or being activated. Ta Chi Exh. TTT, Deposition of Hsu, p. 97; Ta Chi Exh. PPP, Deposition of Cheng, pp. 67–69 incl.; Ta Chi Exh. RRR, Deposition of Chang, pp. 15–17 incl. This would indicate that the fire pump was activated within ten minutes of the initial explosion.

with an explosion, and the explosion activated or caused an acetylene bottle to explode, that the explosion of that acetylene bottle breached the bulkheads into the engine room and into the accommodation spaces, so that from the inception they had a fire which involved, No. 1, very dangerous materials—as far as I know, the most dangerous materials that were on this vessel; No. 2, the fire was in the engine room and in the accommodations simultaneously; No. 3, the stowage of this material in the place that they selected to stow the material was directly underneath the ship's fire main system, as can be seen in at least one of my photographs. When the explosion occurred and these acetylene bottles exploded, it is like a bomb going off, pieces of shrapnel go all over the place, there is a tremendous increase in pressure and heat, and as can be seen in one of the photographs, the rocketing of these cylinders broke the ship's fire main system because the cylinders were stowed directly under the fire main system.

So that in my opinion, the backbone of the ship's capability to deal with the fire was broken at the same time the fire started because the steam smothering system certainly is not effective for the accommodation or for the area where the bottles were stowed.

The prescribed method if one is to deal with an acetylene bottle accident at all, is to use water in a spray form. They didn't have spray nozzles except in the engine room, the engine room was already involved in fire and even if they had spray nozzles, the location of the bottles was such that in the event of an accident, which is certainly foreseeable, involving acetylene, the ship's fire main system would be destroyed at the same time the accident occurred. So that there is no way that anyone on this ship could have dealt with this situation.

In addition, if one is to believe Mr. Cook, which I do, as to the location of the steam smothering valves on the port side, at least, they were also in that same alleyway where the bottles were located. So that at least one of the steam smoth-

ering valves would be totally inaccessible from the inception.

The location of the water command valves, one deck above, was right in the area where the collapse occurred so that they were inaccessible and so that you couldn't isolate anything.

That is the basis, in brief, for my opinion as to why the crew could never have dealt with the situation.

T. 307–309 incl.

Ta Chi's fire expert Rushbrook gave a similar opinion based on years of fire-fighting experience:

Q  I would like to ask you, based on your experience and your physical examination of the vessel, and the depositions of all the witnesses and the documents that have been marked in evidence before this Court, do you have an opinion as to the actions, if any, by the crew after the explosion and fire on November 10, 1975 aboard the "Eurypylus"?

A  I have.

Q  And what's that opinion?

A  I concluded that in the light of all the circumstances, the instant disaster and the many problems to which this led, that the crew conducted themselves in a creditable manner. Just to back up my statement, they did get, we know, two lines of hose to work. This is clear from the evidence of photographs showing burned hose on the after port side deck of the ship. Though I didn't see them, they had obviously—somebody had removed them between the time the ship first came into Los Angeles and the time at which I boarded, which was of course two months—three months after the fire.

And I concluded that in the light of all these circumstances, they had performed quite well. They got the injured men off the ship. No further casualties occurred. Every life was saved. So that it's reasonable to say the officers of the ship were of a good standard.

The fire, in my opinion, from the very few minutes after the initial incident, was of such magnitude that it would have

taken the resources of—I was going to say almost of a city fire brigade, but of a large town fire brigade to put this out.

Had I been called to this five fire minutes or six minutes after it had occurred, from reading the testimony I would have wanted something like ten pumps on this job, ten city appliances, and even then I might not have been able to save very much of the center accommodation. I might have saved the fire from going into No. 5 Hold. I certainly probably would have prevented it going right up. But the center accommodation was away. This fire was beyond the capability of any ship's fire-fighting unit, totally and utterly beyond it.

T. 163–165 incl.

And in response to Connell's suggestion that it might have been possible to save some of the cargo aft Rushbrook was asked the following questions and gave the following answers:

Q. What I would like you to do before asking specifically for your reasons, I would like you to assume that instead of a merchant crew you had your professional fire fighters manning those two hoses with a fire main fully intact, with the emergency fire pump, and let's even say under today's capacities required by the Lloyd's classification society and the other societies, and then with that in mind, I ask you to give me the reasons why you disagree with Mr. Connell?

A. Even with professional firemen on board this ship, having regard to the fact that we have an emergency pump delivering 110 gallons a minute at 65 pounds per square inch, and basing this answer on almost 32 years of actual, practical, physical fire fighting, I cannot see that that fire would have been controlled in the hold spaces.

The reason I say this is that the ship is out at sea, there is no means whereby we can obtain supplies of smothering gas.

The only way to have held that fire in No. 4 hold, and there is very clear evidence that the fire was into No. 4 hold at a very early stage, was by applying an inert gas and holding the fire in a quiescent state until the ship got to port.

In this case we have holes [in] the engine room and everything else and it might entail towing, but, even so, [you] have not CO2 to hold a fire for weeks on end, provided you can keep topping up supplies throughout the period.

But the two very small nozzles, half inch nozzles, I would have used to cool the deck area and, hopefully, if it were possible to get into No. 5 hold, to lightly spray the bulkhead adjoining No. 4 hold in order to put a cooling barrier between the two spaces.

Ideally, if we could get enough gas, I would put gas in both No. 4 and No. 5.

Now, without this gas I am faced with a hopeless situation: I have two half inch nozzles and I cannot control this fire by simply pouring this water on the deck because that will have a minuscule cooling effect on the fire. It will have some effect, but almost immeasurable, or unmeasurable, I think.

This leaves me with a situation where I have to take these hatch covers off and hope that I am going to hit the cargo, and my long experience of such fires is when you take the hatch covers off without any facility, the shore back-up facets, that fire is going to get out of control, and I am absolutely convinced—I don't know exactly what the cargo was, but I think there is testimony to the effect that it was general cargo, some of which inevitably had to be combustible—that fire was going to spread and we would never have been able to hold it with these two half-inch nozzles.

Therefore, the outcome would have been that it would have gone to No. 5, it would have gone to No. 6, it would have gone right aft into the after accommodation, and the final outcome would have been no different than it was when finally the ship was towed into San Francisco —correction, Los Angeles.

Q. Do you have an opinion as to why the No. 1 and No. 2 hatches were not damaged by fire?

A. The ship turned into the wind at one stage and I think it is entirely fortuitous that the fire didn't get so far forward as it did aft. It certainly did get into the upper 'tween of No. 3, but when you look at the configuration of the engine room, as can be seen from the plan on my right, you will notice there are two large tanks, bunker tanks, and it possibly can be seen even more clearly on this Exhibit YYY.

You can see that at the forward end there are a series of four tanks against the forward bulkhead and in the center is the donkey boiler. That tended to form almost a cofferdam, which would delay—not prevent—the fire from moving forward.

Probably the most important reason was that the ship turned into the wind and naturally sailed and the fire was being or tended to be driven aft.

T. 589–592.

## CONCLUSION

The Court concludes that the fire-fighting equipment and the fire-fighting capability of the officers and crew did not make S.S. EURYPYLUS unseaworthy at the commencement of the voyage or at the time of the explosion and fire, and that if such an unseaworthy condition existed it did not have a causal relationship to the cargo loss or damage.

However, although a fire, as here, may originate without the carrier's design or neglect, the duty of the carrier remains to exercise due diligence to control and extinguish it and so minimize the damage. Indeed there is some question whether the fire exemption statutes are relevant since even if the fire was started due to the negligence of the officers and crew (and the Court makes no such finding), the carrier is not charged with starting the fire, but with exacerbating it, and thus breaching its duty as carrier to use reasonable precautions to protect cargo from any type of damage. *American Mail Line, Ltd. v. Tokyo Marine & Fire Ins. Co.,* 270 F.2d 499, 501 (9th Cir. 1959).

Regardless of the cause of the fire, the permanent stowage of acetylene and oxygen cylinders in an enclosed narrow alleyway in close proximity to the engine room and to controls vital to the ship's survival created a clearly foreseeable hazard in the event of an engine room fire. Such fires are not uncommon, and the explosive nature of such cylinders under heat or stress is well known. The open door to the engine room and the additional unsecured cylinders merely accentuated the hazard.

The fact that Ta Chi may not have been responsible for the match that lit the fuse does not exempt them from liability for the ensuing explosion. Ta Chi is liable for that portion of the damage to cargo which would have been averted had the oxygen and acetylene cylinders been stored outside of the midship accommodation house. The burden is on Ta Chi to prove that portion of the damage to cargo which could not have been so averted. In this case they have not borne this burden and accordingly are liable for all damage. *Schnell v. The Vallescura,* 293 U.S. 296, 55 S.Ct. 83, 79 L.Ed. 645 (1934); *Vana Trading Co. v. S.S. Mette Skou,* 556 F.2d 100, 105 (2d Cir. 1977).

Paragraph 9 of the bill of lading (Claimants Exh. 14) provides the liability of cargo to contribute in General Average. It is conditioned upon "the event of accident, danger, damage, or disaster . . . for which or for the consequences of which the Carrier is not responsible." Ta Chi is not entitled to contribution from General Average. *American Mail Line Ltd. v. Tokyo Marine & Fire Ins. Co., supra,* 270 F.2d at 502.

The petition for exoneration and/or limitation is denied.

So ordered.